UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ROBERT A. LIVINGSTON,

                Plaintiff,

v.                                                Case No.  5:04-cv-260-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits and for Supplemental Security Income.  (Doc. 1.)  The Commissioner has answered (Doc. 5), and both parties have filed briefs outlining their respective positions.  (Docs. 10 & 12.)  For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **REVERSED and REMANDED**.

## I. PROCEDURAL HISTORY

      Plaintiff filed applications for disability insurance benefits and supplemental security income on December 21, 2000 alleging a disability onset date of October 11, 2000 (R. 40.)  Plaintiff's application was denied initially (R. 36-37) and upon reconsideration.  (R. 32-34.)  Plaintiff requested a hearing before an Administrative Law Judge, which was held on August 14, 2002.  (R.118.)  On September 11, 2002,

---

[1]Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

following the hearing, Administrative Law Judge Theodore S. Haynes (the "ALJ") issued

a decision unfavorable to Plaintiff.  (R. 12-20.)  Plaintiff's request for review of that

decision was denied by the Appeals Council on May 28, 2004, rendering the ALJ's

decision the final decision of the Commissioner.  (R. 4-6.)  On June 24, 2004, Plaintiff

filed the instant appeal to this Court of the Commissioner's final decision.  (Doc. 1.)

## II.  ISSUES PRESENTED

Plaintiff argues that the ALJ failed to give appropriate weight to the opinion of

Plaintiff's treating physician, Dr. Manoogian, when making his RFC assessment.  (Doc.

10.)  In response, the Commissioner maintains that the ALJ's decision was supported

by substantial evidence, that the determination of the Plaintiff's RFC is solely an

administrative determination, and because the ALJ is not required to adopt the treating

physician's opinion regarding the Plaintiff's functional limitations, the ALJ "committed no

more than harmless error by not including that opinion in the RFC determination."  (Doc.

11.)

Plaintiff also challenges the Commissioner's RFC assessment as contrary to all

three of the medical opinions contained in the record because the RFC did not include

any limitations due to Plaintiff's alleged hearing impairment. Lastly, Plaintiff argues that

the ALJ erred by relying upon an incomplete hypothetical question posed to the

vocational expert.

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[2]  Substantial evidence is more than a scintilla, i.e., the evidence must do

---

[2]See 42 U.S.C. § 405(g).

more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making

---

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13]  Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the Commissioner

---

[8]42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9]20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10]20 C.F.R. § 404.1520(b).

[11]20 C.F.R. § 404.1520(c).

[12]20 C.F.R. § 404.1520(d).

[13]20 C.F.R. § 404.1520(e).

[14]20 C.F.R. § 404.1520(f).

[15]Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16]  The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[18]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such

---

[16]Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17]Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18]Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19]Walker, 826 F.2d at 1003.

[20]Wolfe, 86 F.3d at 1077-78.

evidence.[21]  Only after the Commissioner meets this burden does the burden shift back

to the claimant to show that he or she is not capable of performing the "other work" as

set forth by the Commissioner.

## IV.  SUMMARY OF THE RECORD EVIDENCE

Plaintiff, born on December 12, 1956, was forty-five (45) years of age at the time

of the ALJ's decision.  (R. 149-50.)  He completed high school through the tenth

grade,[22] and in the  fifteen years prior to the ALJ's decision, the Plaintiff held three

separate jobs.  (R. 64.)  Most recently, from 1998-1999, Plaintiff worked as a local

delivery driver for a pipe supplier.  (R. 65, 151.)  In this job, Plaintiff loaded and

unloaded pipes from his delivery truck, tasks that required a combination of sitting and

standing all day.[23]  As a truck driver, Plaintiff did not carry anything over ten pounds and

had assistance if he needed to lift heavier objects.  (*Id.* )

Due to his back problems and an injury in 1991 (R. 42, 90), Plaintiff worked off

and on for a couple of years.  (R. 66.)  Between 1988 and 1991, Plaintiff worked as a

mower operator for Lake County.  At this job, Plaintiff mowed the sides of roads, fixed

roads, and filled potholes, tasks which involved walking, standing or sitting for most of

the day.  He was required frequently to stoop to do his work.  The heaviest objects he

---

[21] See id.

[22] There is some discrepancy in the record concerning the Plaintiff's level of education.  According to the Social Security Disability Report, Adult Form (R. 72-81), Plaintiff disclosed that he had completed high school through the tenth grade.  (R. 79.)  In Plaintiff's brief he also asserts that he completed high school through the tenth grade.  (Doc. 10, Part B, ¶1.)  However, in his testimony at the hearing, Plaintiff testified that he had only completed school through the ninth grade.  (R. 150.)

[23] In Plaintiff's testimony, Plaintiff stated that he worked as a driver for two different companies over two different periods of time.  Between the two companies, he worked for about two and one-half years.  (R. 151.)

lifted as a mower operator weighed eighty pounds, although he usually did not have to lift objects weighing more than twenty-five pounds.  (R. 64, 67, 152.)  From 1981 to 1988, Plaintiff worked as a custodian for the Lake County School Board.  In this job, Plaintiff mowed the lawns, waxed, washed, and swept the classroom floors, as well as disposed of the garbage.  He spent most of the day walking or standing, infrequently sitting, and occasionally stooping in this job.  He frequently lifted objects of twenty-five pounds, but the heaviest objects he lifted weighed eighty pounds.  (R. 64, 67, 153.)

Plaintiff claims that he became unable to work on October 11, 2000 due to constant back pain which caused him continuously to fall due to numbness in his left leg and the collapse of his right leg.  (R. 83, 151.)  As this appeal concerns Plaintiff's alleged back problems and their effects on his ability to work, the Court will focus upon those portions of the medical record most relevant to Plaintiff's complaints of back pain.

After filing for social security benefits, Plaintiff was referred to Dr. James Ryan ("Dr. Ryan") for a consultative exam on February 16, 2001.  (R. 90-91.)  At that time, Plaintiff told Dr. Ryan that his back pain began after an accident at work in 1991.  He had been treated by various physicians at that time, one of whom recommended surgery which Plaintiff did not pursue.[24]  According to Dr. Ryan's notes, Plaintiff reported that he had been having severe and constant back pain for ten years that radiated into his legs and hips.  The pain made it difficult for Plaintiff to sleep and any activity exacerbated the problem.  Plaintiff had found little to give him relief from this condition. Dr. Ryan found no abnormalities in his physical exam or analysis of X-rays.  Because

---

[24] According to the record, many of Plaintiff's physicians suggested he have surgery to cure his back pain, but due to the expense, Plaintiff could not afford to do so.   (R. 97, 104, 160.)

Dr. Ryan could not explain Plaintiff's pain from the procedures he performed, he concluded the Plaintiff should be able to perform moderate to heavy duty work.  (*Id.*)

On May 30, 2001, Plaintiff was treated by R. Kim Etheredge ("Dr. Etheredge"), a chiropractor, after Plaintiff was referred by two other doctors.  Dr. Etheredge found that Plaintiff had a herniated[25] disc at L5-S1 [26] with pain accompanying all ranges of motion in his lumbar spine.  Dr. Etheredge ordered an MRI, which was reviewed by both Dr. Etheredge and Dr. Mark Herbst.  Dr. Herbst found marked dessication and narrowing of disc space at L5-S1.  He also found swelling of the S1 nerve root and that the protrusion of the L5-S1 disc impinged upon the S1 nerve root.  (R. 100.)  Dr. Etheredge concurred with Dr. Herbst's findings in his June 7, 2001 notes and suggested that Plaintiff pursue surgery in order to fully solve his back problems.

In addition, Dr. Etheredge noted his disagreement with Dr. Ryan, specifically Dr. Ryan's assessment that Plaintiff could engage in moderate to heavy lifting.  (R. 97.) When Plaintiff returned to see Dr. Etheredge on June 21, 2001, Dr. Etheredge noted that Plaintiff was "incapable of lifting greater than 15-20 pounds" and could not bend forward, stoop, sweep, or mop.  Dr. Etheredge found that Plaintiff "should not be allowed to stand in any position longer than 15-20 minutes,"[27] or sit longer than 30-45

---

[25] A herniated disk is "an intervertebral disk (a disk between adjacent vertebrae) in which the pulpy or soft center has been pushed out and through the surrounding tougher part, thus forming a protruding mass." 3-H Attorneys' Dictionary of Medicine  2587 (2004).

[26] L5-S1 "refer[s] to the fourth and fifth lumbar and first sacral vertebrae of the spine."  The nerves connected to these vertebrae are the roots of the spinal nerves which carry sensory nerve fibers.  5-P Attorneys' Dictionary of Medicine Scope 1 (2004).

[27] The ALJ noted the contradiction in Dr. Etheredge's report in which he opined that the Plaintiff "should not be allowed to stand in any position longer than 15-20 minutes," but also wrote later in the report Plaintiff "should not be required to stand in any one position greater than half and hour."  (Doc. 96.)

minutes.  He recommended "very sedentary" work.  Dr. Etheredge also noted Plaintiff's hearing impairment and suggested that such an impairment might preclude Plaintiff from telephone or telemarketing jobs.  (R. 96.)

On July 5, 2001, Plaintiff consulted with Dr. Peter Godleski ("Dr. Godleski").  Dr. Godleski noted Plaintiff's complaints of continued pain, which worsened with movement or activity.  Plaintiff also reported to Dr. Godelski that, at times, his left leg becomes numb and the right leg "gives way."  Dr. Godleski noted that Plaintiff attempted  to alleviate the pain with Aspirin and Darvocet.  Dr. Godleski described the Plaintiff as "alert, oriented, pleasant and cooperative," but found that "the lumbar spine was tender to palpitation" in various places.  (R. 101.)  In addition, Dr. Godleski found that Plaintiff experienced pain when he tested Plaintiff's range of motion and that Plaintiff had a loss of sensation in the left leg and thigh.  (R. 101-2.) Dr. Godleski also made note of Plaintiff's complaints of hearing loss.  After reviewing the MRI, Dr. Godleski concluded that Plaintiff suffered from a lumbosacral sprain or strain[28] with disc herniation at L5-S1.  Dr. Godleski prescribed Vioxx for Plaintiff's pain.  (R. 102).

On October 11, 2001, Plaintiff visited Dr. Vrej K. Manoogian for treatment.  Dr. Manoogian noted Plaintiff's severe pain when "bending, lifting, or sitting" or standing, and that Plaintiff often had to lie down to relieve the pain.  Dr. Manoogian also noted that physical therapy, chiropractic treatment, and anti-inflammatory medications had done little to help Plaintiff's condition.  Dr. Manoogian concurred with Dr. Herbst's

_____

[28] A lumbosacral sprain involves "the joint between the fifth lumbar vertebra and the sacrum.  The usual cause is forcible motion involving the lower part of the back.  It is marked by pain (especially on movement), tenderness, muscle spasm, and limitation of motion.  It has a tendency to recur."  3-L Attorneys' Dictionary of Medicine 4160 (2004).

findings regarding the MRI and echoed the prior diagnoses of the other doctors, finding that Plaintiff "has severe loss of L5-S1 disc space with near bone to bone contact" which was evidence of "significant degenerative disc disease at the L5-S1 level"[29] with a protruding extruded disc.  (R. 103.)  Like the other doctors, Dr. Manoogian found that Plaintiff would be a candidate for surgery. However, Plaintiff chose to pursue more conservative treatment with medication and a home exercise program. After examining the MRI, conducting a physical exam and interviewing the Plaintiff about his condition, Dr. Manoogian made the following recommendation concerning Plaintiff's functional limitations:

> I do not recommend that the patient [Plaintiff] do any heavy lifting above 10 lbs. or any kneeling, crawling, twisting, bending, stooping, climbing or repetitive work with his back.  I also do not recommend any prolonged periods of sitting or full time sedentary work, since this can also significantly aggravate the herniated disc.

(R. 103.)  On July 11, 2002, Plaintiff returned to Dr. Manoogian for treatment, complaining of increased pain.  Dr. Manoogian found that Plaintiff was walking with a slight limp and had pain at all ranges of motion due to Plaintiff's severe degenerative disc disease.  Dr. Manoogian again reiterated that Plaintiff would be a candidate for surgery or epidural steroid injections.  Dr. Manoogian advised the Plaintiff to continue on anti-inflammatory drugs and gave him a prescription for Darvocet for severe pain.  (R. 130.)

---

[29] Degenerative disc disease refers to the "gradual deterioration of the disc between vertebrae." Such degeneration makes "the disc more susceptible to herniation. . . which can cause local pain in the affected area."  William C. Shiel, Jr., MD, FACP, FACR, Degenerative Disc Diseases and Sciatica, MedicineNet.com, at http://www.medicinenet.com/degenerative_disc/article.htm (last visited September 8, 2005).

On October 8, 2002, Dr. Manoogian again examined Plaintiff.  Dr. Manoogian noted that Plaintiff's limp had become worse and that Plaintiff complained of pain in his legs.  Plaintiff also told Dr. Manoogian that when he walked for an extended period of time his left leg became weak which caused him to fall.  Plaintiff told Dr. Manoogian that after two hours of standing or activity, he develops increasingly worse low back and left leg pain, which makes it difficult for him to sit or stand or to do his normal daily activities.  Dr. Manoogian noted a limited range of motion in Plaintiff's lumbar spine and pain with any forward or side bending.  Dr. Manoogian notes reflect that he again discussed with Plaintiff surgery or epidural steroid injections.  Plaintiff stated to Dr. Manoogian that because he could not afford surgery or injections, he wanted to continue with the more conservative treatment.  Plaintiff, however, also told Dr. Manoogian that the medications were difficult for him to afford. As a result Dr. Manoogian gave Plaintiff a month's supply of Bextra for pain.  (R. 137.)

On January 28, 2003, Plaintiff returned for a check-up, complaining of increased pain down the right leg and an increase of numbness and tingling in the right thigh. Plaintiff's pain continued to worsen with any activity such as sitting or walking. Plaintiff could only alleviate the pain by lying down.  Pinch sensation was slightly decreased.  Dr. Manoogian diagnosed Plaintiff again with severe degenerative disc disease with foraminal stenosis[30] and a herniated disc L5-S1 with radiculopathy.[31]   Dr. Manoogian

---

[30]"Foraminal stenosis" is the medical term for the narrowing of the disc space in Plaintiff's lumbar spine detected on the MRI and a common result of degenerative disc disease.

[31]Radiculopathy refers to "any disease or abnormality of a dorsal or ventral (sensory or motor) spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins its companion root (a motor or a sensory) to form a spinal nerve."  5-R Attorneys' Dictionary of

(continued…)

again gave Plaintiff samples of Bextra and a prescription for Darvocet for any "break-through" pain.  Plaintiff declined a Depo-Medrol injection.  (R. 145.)

On August 22, 2003, Plaintiff made his final visit to Dr. Manoogian.  The doctor noted additional loss of disc space at the L5-S1 level with foraminal narrowing and that pinch sensation in the later aspect of both feet, i.e. bilaterally, had also decreased.  Dr. Manoogian gave Plaintiff samples of Vioxx and recommended Darvocet for additional pain.  (R. 144.)

After reviewing the evidence, including Plaintiff's testimony and portions of the medical records, the ALJ determined that Plaintiff suffered from a "back disorder and hearing loss."  These impairments are "severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (R. 16.)

The ALJ found that the Plaintiff retained the physical RFC

> to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally, stand and/or walk for about 6 hours total in an 8-hour workday, and sit for about 6 hours total in an 8-hour workday and 30 to 40 minutes without interruption.

(R. 18.)  While the ALJ stated that "[t]he opinions expressed by Dr. Manoogian are entitled to greater weight than those expressed by Dr. Ryan or Dr. Etheredge because he is a treating medical doctor," the ALJ went on to adopt selected opinions of Dr. Ryan, who was only a consultative examiner, and Dr. Etheredge, but not the opinion of Dr. Manoogian with regard to Plaintiff's functional limitations.

───────────────

[31](...continued)
Medicine 218 (2004).  It also refers to the "nerve irritation caused by damage to the disc between vertebrae" caused by the degeneration of the disc. Shiel, supra note 29 at http://www.medicinenet.com/degenerative_disc/page2.htm (last visited September 8, 2005).

## V.  **DISCUSSION**

Plaintiff contends that the ALJ erred because he failed to adopt the opinion of Plaintiff's treating physician, Dr. Manoogian, with regard to Plaintiff's functional limitations.  Specifically, Plaintiff alleges that while the ALJ stated that Dr. Manoogian's opinion was entitled to greater weight as Plaintiff's treating physician, the ALJ, nonetheless, made an RFC finding that completely ignores Dr. Manoogian's opinion.

It is well established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[32]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[33]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[34]  Where a treating physician has merely made conclusory statements, the

---

[32] Crawford v. Comm'r of Soc. Sec., 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards, 937 F.2d at 583-584; Sabo v. Comm'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[33]20 C.F.R. § 404.1527(d)(2).

[34]Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[35]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[36]  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[37]

Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court determines that the ALJ failed to properly consider the opinion of Dr. Manoogian.  Despite Dr. Manoogian's extensive clinical notes summarized above and the results of an MRI, the ALJ considered the opinions of the consultative examiner, Dr. Ryan, and Plaintiff's former chiropractor, Dr. Etheredge, over Dr. Manoogian's recommendations.  Dr. Ryan and Dr. Etheredge both saw the Plaintiff less often and treated and/or examined him over a shorter period of time.  Although the ALJ at no point in his opinion explicitly discounted the findings of Dr. Manoogian, his failure to provide discussion of his consideration of the treating physician's opinions, or

---

[35]Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[36]20 C.F.R. § 404.1527(d).

[37]Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

the weight granted thereto, makes it impossible for the Court to evaluate the reasons

supporting the ALJ's decision not to accord Dr. Manoogian's opinion appropriate weight.

As discussed above, in his FRC finding, the ALJ found that the Plaintiff retained

the residual functional capacity to lift and/or carry up to ten (10) pounds frequently and

twenty (20) pounds occasionally, stand and/or walk for about six (6) hours total in an

eight-hour workday and sit for about six (6) hours total in an 8-hour workday and thirty to

forty minutes without interruption.  (R. 18.)  In stark contrast, Dr. Manoogian's October

11, 2001 treatment plan for Plaintiff includes specific limitations on Plaintiff's activity,

including the functional limitation that Plaintiff not do any heavy lifting above 10 pounds

or any kneeling, crawling, twisting, bending, stooping, climbing or repetitive work.  Dr.

Manoogian also recommended that Plaintiff not sit for " prolonged periods" of time or do

"full time sedentary work." Dr. Manoogian placed these restrictions on the Plaintiff's

activities to control the pain caused by severe degenerative disc disease and disc

herniation which impinged on almost all of Plaintiff's life activities.  (R. 104.)

Dr. Manoogian treated the Plaintiff five times between October 11, 2001 and

August 22, 2003.  During this period of time he noted a decline in Plaintiff's condition at

each visit, and during these visits discussed more permanent options with the Plaintiff to

remedy his condition, such as surgery and steroid injections.  In addition, Dr.

Manoogian's observations and treatment are consistent with the Plaintiff's own testimony

about his condition and how it impairs his daily activities.  (R.  151-163.)

While Dr. Ryan, the consultative physician, found that Plaintiff could "perform

moderate to heavy duty work" based on a physical exam and x-rays, Dr. Ryan did not

have the benefit of the results of the MRI performed four months later. Moreover, Dr. Ryan only examined Plaintiff on one occasion.

Dr.  Etheredge saw Plaintiff only three times.  He concluded that Plaintiff should not lift anything heavier than fifteen (15) to twenty (20) pounds, or stand for longer than fifteen (15) to twenty (20) minutes (and certainly no more than half an hour) in any one position, or sit for more than thirty (30) to forty (40) minutes.  Dr. Etheredge recommended that any work performed by the Plaintiff would have to be very sedentary.

Despite the inconsistencies within Dr. Etheredge's own opinion, the ALJ's RFC is more in line with Dr. Etheredge's restrictions, rather than those specified by Dr. Manoogian.  Because Plaintiff is alleging that his back problems prevent him from working, the ALJ was required to either give substantial weight to the medical evidence generated by Plaintiff's treating physician or articulate adequate reasons for discounting the evidence.  The ALJ's failure to do so is legal error.

Accordingly, the Court concludes that the ALJ's failure to incorporate any of Dr. Manoogian's restrictions into his RFC assessment - nor provide any reason for rejecting them - evidences that the ALJ did not accord them the proper weight in making his RFC assessment.  Because the ALJ erred by failing to accord appropriate weight to the opinion of Dr. Manoogian, this matter is due to be reversed and remanded to the Commissioner for proper consideration of the treating physician's opinion.  On remand, the Commissioner should develop a new RFC assessment, giving appropriate weight to Dr. Manoogian's opinion.  Once the Commissioner makes a new RFC assessment, the Commissioner must review the level of exertion the Plaintiff can perform consistent with the new assessment.

Additionally, even though this matter is due to be remanded so that the ALJ can make a new RFC assessment - and therefore the Court does not need to address whether there was error because the hypothetical question posed to the VE was incomplete - there was error in the ALJ's evaluation of the exertional requirements of Plaintiff's past work as a mower operator. Relying upon the opinion of a vocational expert, the ALJ found that Plaintiff could perform his past relevant work as a mower operator as it is performed in the national economy.  The vocational expert opined that the strength requirement for a mower operator was light work.  However, work similar to the work performed by Plaintiff is classified in the Dictionary of Occupational Titles under §406.684-014 Groundskeeper, as "medium work" requiring the exertion of "20 to 50 pounds of force occasionally, and/or 10 to 25 pound of force frequently, and or greater than negligible up to 10 pounds of force constantly to move objects.  Physical Demand requirements are in excess of those for Light Work."[38]  On remand depending upon the new RFC assessment, the ALJ should re-evaluate Plaintiff's past relevant work at the appropriate exertional level.[39]

---

[38] Dictionary of Occupational Titles 406.684-014 (4th ed. 2001).

[39] Further, in making a new RFC assessment the ALJ should consider, if appropriate, any limitations cause by hearing loss. In his opinion, the ALJ found that the Plaintiff's hearing loss was a "severe" impairment.  (R. 16.)  In most of the medical records, the doctors made note of the Plaintiff's complaints of hearing loss and Dr. Etheredge went so far as to say that this probably would preclude the Plaintiff from telemarketing or other jobs where use of the telephone was required.  (R. 96.)  The Plaintiff also testified that when he is in a room with many people who are talking at once, there is noisy equipment, or anything else that makes a lot of noise, his hearing is even more impaired.  (R. 158.)  An individual's communicative abilities, such as speech and hearing are nonexertional capacity elements that must be taken into consideration when determining the RFC.  Assessing Residual Functional Capacity In Initial Claims, 61 Fed. Reg.  34,474, 34,477 (Soc. Sec. Admin. July  2, 1996).  Accordingly, on remand the Commissioner should take into consideration the Plaintiff's hearing loss when formulating a new RFC assessment and, if appropriate, the limitations from the hearing loss should be included in any hypothetical questions posed to a VE in assessing whether there are other jobs the Plaintiff can perform in the national economy.

17

## VI.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner, for an Administrative Law Judge to: (1) properly consider the opinion of Plaintiff's treating physician and accord that opinion the appropriate weight in making a new RFC assessment; (2) consider the effect, if any, of Plaintiff's hearing loss on Plaintiff's RFC; and (3) conduct any additional proceedings the Commissioner deems appropriate.

**IN CHAMBERS** in Ocala, Florida, on September 12, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
The Honorable Wm. Terrell Hodges
Senior United States District Judge

Counsel of Record